UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

GERALDINE T.[1],                )   NO. EDCV 18-00019-KS
                   Plaintiff,   )
                                )
        v.                      )   MEMORANDUM OPINION AND ORDER
                                )
NANCY A. BERRYHILL, Acting      )
Commissioner of Social Security,)
                   Defendant.   )
_____ )

## INTRODUCTION

Geraldine T. ("Plaintiff") filed a Complaint on January 4, 2018, seeking review of the denial of her application for supplemental security income ("SSI"). On February 23, 2018, the parties consented, pursuant to 28 U.S.C. § 636(c), to proceed before the undersigned United States Magistrate Judge. (Dkt. Nos. 11-13.) On August 22, 2018, the parties filed a Joint Stipulation ("Joint Stip."). (Dkt. No. 17.) Plaintiff seeks an order reversing the Commissioner's decision and ordering the payment of benefits or, in the alternative, remanding for further proceedings. (Joint Stip. at 24.) The Commissioner requests that the

_____

[1] Partially redacted in compliance with Federal Rule of Civil Procedure 5.2(c)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

1

ALJ's decision be affirmed or, in the alternative, remanded for further proceedings. (*See* AR 25.) The Court has taken the matter under submission without oral argument.

## SUMMARY OF ADMINISTRATIVE PROCEEDINGS

On September 25, 2012, Plaintiff, who was born on October 5, 1961, filed an application for SSI.[2] (*See* Administrative Record ("AR") 13, 170; Joint Stip. at 2.) Plaintiff alleged disability due to: vertigo; deformity in feet, elbow, knees; cataracts; damaged corneas; anxiety; depression; and "lung capacity is nil." (AR 191.) Plaintiff reported working as an administrator in electronics and, *inter alia*, a manager for an RV dealer (AR 192), but the Commissioner determined that none of Plaintiff's prior employment satisfied the standard for "past relevant work." (AR 21, 53.) After the Commissioner denied Plaintiff's applications initially (AR 75) and on reconsideration (AR 94), Plaintiff requested a hearing (AR 110-12). Administrative Law Judge Helen E. Hesse ("ALJ") held a hearing on April 12, 2016. (AR 27.) Plaintiff, who was represented by counsel, testified before the ALJ as did vocational expert ("VE") Alan Boroskin. (AR 27-56.) On August 4, 2016, the ALJ issued an unfavorable decision, denying Plaintiff's application. (AR 13-22.) On September 5, 2017, the Appeals Council denied Plaintiff's request for review. (AR 1-6.)

## SUMMARY OF ADMINISTRATIVE DECISION

The ALJ found that Plaintiff had not engaged in substantial gainful activity since her September 25, 2012 application date. (AR 15.) The ALJ determined that Plaintiff had the following severe impairment: chronic obstructive pulmonary disease. (AR 15.) The ALJ also found that Plaintiff had the following non-severe impairments: cataracts; right elbow minimal

---

[2]     Plaintiff was 50 years old on the application date and thus met the agency's definition of a person closely approaching advanced age. *See* 20 C.F.R. § 416.963(d). Plaintiff has since changed age categories and is now a person of advanced age. *See id.* § 416.963(e).

degenerative joint disease; hallux valgus with co-existing hammertoes in her left foot; depression; and marijuana use. (AR 15-16.) The ALJ also found that Plaintiff's alleged impairments of a remote history of breast cancer, vertigo symptoms, incontinence, and rheumatoid arthritis were not medically determinable. (AR 15-16.) The ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. part 404, subpart P, appendix 1 (20 C.F.R. § 416.920(d), 416.925, 416.926). (AR 17.) The ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform medium work with the following limitations:

> Sit 6 hours out of an 8-hour day; stand and walk 6 hours out of an 8-hour day with normal workday breaks; occasionally lift 50 pounds, frequently lift 25 pounds; frequently climb stairs, bend, balance, stoop, kneel, crouch, crawl; occasionally climb ladders, ropes, or scaffolding; precluded from concentrated exposure to unprotected heights, dangerous or fast moving machinery; and precluded from exposure to dust, fumes, gases, chemicals, and other air pollutants.

(AR 18.)

The ALJ found that Plaintiff had no past relevant work. (AR 21.) However, the ALJ also found that, considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, including the representative occupations of laundry worker (DOT 361.684-014) and packager (DOT 920.587-018). (AR 22.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security Act, from the application date through the date of the ALJ's decision. (AR 22.)

\\
\\

3

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), this Court reviews the Commissioner's decision to determine whether it is free from legal error and supported by substantial evidence in the record as a whole. *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007). "Substantial evidence is 'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519, 522-23 (9th Cir. 2014) (internal citations omitted). "Even when the evidence is susceptible to more than one rational interpretation, we must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record." *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012).

Although this Court cannot substitute its discretion for the Commissioner's, the Court nonetheless must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the [Commissioner's] conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (internal quotation marks and citation omitted); *Desrosiers v. Sec'y of Health and Hum. Servs.*, 846 F.2d 573, 576 (9th Cir. 1988). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).

The Court will uphold the Commissioner's decision when the evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). However, the Court may review only the reasons stated by the ALJ in his decision "and may not affirm the ALJ on a ground upon which he did not rely." *Orn*, 495 F.3d at 630; *see also Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003). The Court will not reverse the Commissioner's decision if it is based on harmless error, which exists if the error is "'inconsequential to the ultimate nondisability determination,' or if despite the legal error, 'the

agency's path may reasonably be discerned.'" *Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015) (internal citations omitted).

## DISCUSSION

The sole issue in dispute is whether, at step two of the sequential analysis, the ALJ properly considered the opinion of Plaintiff's treating psychiatrist in assessing whether Plaintiff has a severe mental impairment.

## I.     Applicable Law

At step two of the sequential analysis, the ALJ must determine whether the claimant has a medically determinable impairment, or combination of impairments, that is "severe." The Commissioner defines a severe impairment as "[a]n impairment or combination of impairments . . . [that] significantly limit[s] your physical or mental ability to do basic work activities," including, *inter alia*: "understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting." 20 C.F.R. § 416.922. "An impairment or combination of impairments may be found not severe *only if* the evidence establishes a *slight* abnormality that has no more than a *minimal* effect on an individual's ability to work." *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (emphasis added) (citations and internal quotation marks omitted). If "an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation should not end with the not severe evaluation step." *Id.* at 687 (citation and internal quotation marks omitted). "Step two, then, is a *de minimis* screening device [used] to dispose of groundless claims, and an ALJ may find that a claimant lacks a medically severe impairment or combination of impairments only when

[her] conclusion is clearly established by medical evidence." *Id.* (emphasis added) (citations and internal quotation marks omitted).

## II.    The Medical Evidence

The Court begins its analysis with a review of the relevant medical evidence.  The Administrative Record reflects that Plaintiff has a long history of receiving of mental health treatment.  The earliest records come from Dr. Naresh Patel, a psychiatrist with the Riverside County Department of Mental Health.  (*See* AR 796.)

### A. Dr. Patel

On November 27, 2012, Dr. Patel diagnosed Plaintiff with major depressive disorder, recurrent, severe with psychotic features, and anxiety disorder.  (AR 796.)  Dr. Patel indicated that Plaintiff was a single mom of a three year old and engaged in a custody battle with the woman who donated her egg so that Plaintiff could have a child.  (AR 796.)  Plaintiff's mental health exam indicated that Plaintiff's mood was "depressed, sad, anxious" and her affect "constricted.  (AR 798.)  Plaintiff continued seeing Dr. Patel through Riverside County's CalWorks Program on a monthly basis through September 2015, just shy of three years, at which point she was no longer eligible to continue receiving services through CalWorks.  (AR 801-888.)  During these visits Plaintiff reported poor sleep (AR 801, 805, 811, 817, 819, 821, 799, 821, 825, 866, 870, 874, 880, 884, 886), auditory hallucinations (AR 809, 811, 813, 819, 799, 823, 825, 868, 870, 874, 880, 882, 884, 886), visual hallucinations (AR 809, 811, 813, 815, 819, 799, 823, 825, 868, 872, 886, 888), and feelings of irrational fears or paranoia (AR 817 (August 14, 2013 – Plaintiff kept envisioning her daughter being hit by a car and reported paranoia, believing people were talking about her), 819 (August 21, 2013 – Plaintiff reported fearing that something bad will happen to her and someone would hurt her), 821 (October 2, 2013 – Plaintiff reported believing that something bad would happen to her), 799 (October 30,

2013 – Plaintiff reported believing that people talk about her), 872 (October 15, 2014 – Plaintiff reported paranoia), 874 (November 12, 2014 – Plaintiff reported believing that people talk about her).)  Dr. Patel prescribed a variety of antidepressants and antipsychotics over the years but never seemed to find a combination that reliably controlled Plaintiff's mental health symptoms without causing unpleasant side effects.  (*See, e.g.,* AR 802 (11/27/12 – increased Elavil), 804 (2/6/13 – increased Elavil), 805 (2/26/13 – increased Elavil), 810 (5/8/13 – discontinued Zoloft and started Seroquel), 811 (5/28/13 – discontinued Elavil due to weight gain, increased Celexa and Seroquel), 820 (8/21/13 – increased Paxil and Seroquel), 822 (10/2/13 – increased Seroquel), 800 (10/30/13 – increased Paxil and Seroquel), 824 (12/4/13 – increased Seroquel), 866 (5/28/14 – increased Trazodone), 868 (7/9/14 – increased Risperdal), 870 (9/24/14 – increased Risperdal), 872 (10/15/2014 – discontinued Risperdal, started Geodon, increased Paxil), 874 (11/12/14 – restarted Risperdal, discontinued Geodon, increased Paxil), 876 (12/24/2014 – decreased Trazodone and Risperdal due to dizziness), 879 (1/21/2015 – increased Trazodone and decreased Risperdal, Plaintiff exhibited eye twitching and abnormal tongue/mouth movements), 880 (2/18/15 – discontinued Risperdal, started Latuda), 886 (9/9/2015 – discontinued Paxil and Latuda, started Cymbalta and Zyprexa, and increased Trazodone).)  On September 23, 2015, Dr. Patel informed Plaintiff that she no longer belonged to the CalWorks Program and would need to see a different psychiatrist.  (AR 888.)

**B.  Dr. Kurre**

Dr. Patel referred Plaintiff to the Orange Psychiatric Medical Group.  (*See* AR 754.)  On October 14, 2015, prior to her first appointment with her new psychiatrist, Plaintiff saw Wendy Cohen, one of the marital and family therapists with the Orange Psychiatric Medical Group.  (AR 758.)  Plaintiff reported worsening symptoms, hallucinations, irritability, mood swings, restlessness, and sleep disturbance.  (AR 758.)  Plaintiff described her visual hallucinations as "shadows, smoke, faint images" and stated that she "hears noises, voices outside her head like the sound of TV on in another room where she can hear noise but not particular words."  (AR

759.) Plaintiff stated that she does not have family or friends for social support. (AR 759.) Plaintiff indicated that she lives with her boyfriend and, having lost all cash aid, is dependent on her boyfriend to provide for her and her daughter. (AR 759.) Plaintiff stated that she "is not sure if she is staying with [her boyfriend] for the relationship or for the support he offers" and expressed concern that her boyfriend is "controlling." (AR 759.) Plaintiff also indicated that she receives "support" from her daughter's godmother, who is also her daughter's teacher. (AR 759.)

On October 22, 2015, Plaintiff saw Dr. Rojababu Kurre, a psychiatrist with the Orange Psychiatric Medical Group. (AR 754.) At the initial visit, Dr. Kurre noted that Plaintiff was a single mom with a live-in boyfriend. (AR 754.) In the mental health exam, Dr. Kurre described Plaintiff as "fidgeting, disheveled appearance, restless, and tired" and wrote that Plaintiff appeared depressed, anxious, and paranoid with a "labile mood," Plaintiff's speech was pressured, and Plaintiff had auditory, but not visual hallucinations. (AR 755.) The record indicates that, from the date of this initial visit, Dr. Kurre saw Plaintiff on a nearly monthly basis through May 2016, when he issued his medical opinion in this case. (AR 750-788.) During those visits, Plaintiff routinely reported auditory hallucinations (AR 752, 750, 748, 746, 743, 741) as well as some visual hallucinations (AR 746, 741) and often appeared depressed (AR 752, 746, 743, 741).

On May 23, 2016, Dr. Kurre completed a Mental Impairment Questionnaire. (AR 780-89.) On that questionnaire, Dr. Kurre identified Plaintiff's diagnosis as major depression and assessed a GAF score of 50.[3] Dr. Kurre identified Plaintiff's medications as: Klonopin, a medication used to treat, *inter alia*, panic disorder; Remeron, an antidepressant; Cymbalta, a

---

[3] A GAF score of 41-50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *See* Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 34 (revised 4th ed. 2000). The Commissioner has stated that the GAF scale "does not have a direct correlation to the severity requirements in [the] mental disorders listings," 65 Fed. Reg. 50764, 50764-65 (Aug. 21, 2000), and the most recent edition of the DSM "dropped" the GAF scale. Diagnostic And Statistical Manual Of Mental Disorders 16 (5th ed. 2012).

second antidepressant; Risperdal, an antipsychotic; and Zyprexa, a second antipsychotic. (AR 780.) Dr. Kurre listed his clinical findings as "ongoing depression, auditory and visual hallucinations," and he stated that Plaintiff's prognosis was "poor." (AR 780.)

On a check the box form, Dr. Kurre identified Plaintiff's symptoms as including: mood disturbance; difficulty thinking or concentrating; persistent disturbances of mood or affect; apprehensive expectation; intense and unstable interpersonal relationships and impulsive and damaging behavior; perceptual or thinking disturbances; hallucinations or delusions; easy distractibility; and sleep disturbance. (AR 781.) Dr. Kurre indicated that Plaintiff was "unable to meet competitive standards" in her ability to: maintain regular attendance and be punctual within customary tolerances; sustain an ordinary routine without special supervision; complete a normal workday and workweek without interruptions from psychologically based symptoms; and perform at a consistent pace without an unreasonable number and length of rest periods. (AR 782.) Dr. Kurre also indicated that Plaintiff was seriously limited in her ability to: remember work-like procedures; maintain attention for a two hour segment; work in coordination with or proximity to others without being unduly distracted; maintain socially appropriate behavior; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to changes in a routine setting; and be aware of normal hazards and take appropriate precautions. (AR 782-83, 785.)

Dr. Kurre indicated that Plaintiff had a "complete inability to function independently outside the area of one's home." (AR 784.) Dr. Kurre assessed "marked" limitations in Plaintiff's ability to engage in activities of daily living, maintain social functioning, and maintain concentration, persistence, or pace. (AR 787.) Dr. Kurre further indicated that Plaintiff, within a 12-month period, had "four or more" episodes of decompensation, which Dr. Kurre defined as "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing

activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." (AR 787.) Dr. Kurre predicted that Plaintiff's mental impairments would cause her to be absent from work more than four days a month. (AR 788.)

## C. Dr. Shore

On June 14, 2013, while Plaintiff was receiving psychiatric care with Dr. Patel, Plaintiff underwent a psychological examination with Ted Shore, Ph.D., licensed psychologist, in connection with her application for SSI. (AR 430-35.) Plaintiff reported to Dr. Shore that she was unmarried with one child then age three (AR 431) and could take care of her personal hygiene, perform chores, and care for her child but found her typical day "stressful" (AR 432). Plaintiff's speech was abnormal, she had difficulty speaking in full sentences, and Dr. Shore speculated that she had a "moderate/severe speech impairment." (AR 432.) Dr. Shore indicated that he did not review any records from Plaintiff's psychiatrist (*see* AR 430), and, seemingly based on that review, stated that Plaintiff's "history does not indicate hallucinations" (AR 432). Plaintiff's mood was appropriate but also "somewhat anxious." (AR 432.) Plaintiff demonstrated appropriate attention and concentration during the mental health exam. (AR 432.) She was mildly impaired in her performance on the Part A of the Trail Making Test and moderately impaired in her performance on Part B of that same test, suggesting that she can perform simple tasks in a competent manner and detailed and complex tasks accurately but slowly. (AR 432.) On the Wechsler Memory Scale, Dr. Shore found that Plaintiff's memory fell within the "borderline/low-average range. (AR 434.) Dr. Shore diagnosed Plaintiff with alcohol abuse in remission, expressive language disorder, generalized anxiety disorder, and a possible cognitive disorder. (AR 434.) Based on these findings, Dr. Shore opined, *inter alia*, that Plaintiff was moderately limited in her ability to maintain regular attendance and manage stress in a typical work setting. (AR 435.)

\\
\\

**D. Dr. Stanciell**

On May 5, 2014, Plaintiff underwent a psychiatric examination by board certified psychiatrist, Earbin Stanciell, M.D., in connection with her application for SSI. (AR 473-76.) Dr. Stanciell stated "all medical records were reviewed," without specifically indicating whether he had reviewed any treating records. (*See* AR 473.) Plaintiff reported that she is single and has one four year old child. (AR 474.) Plaintiff reported experiencing severe stuttering and episodically feeling like there are bugs on her. (AR 473.) Plaintiff reported that she does not do household chores, run errands, shop, or cook and she does not manage her own money. (AR 474.) Dr. Stanciell did observe severe stuttering. (AR 475.) Plaintiff's mood was anxious, but her mental health exam was otherwise normal. (AR 475.) Dr. Stanciell assessed Plaintiff with a GAF score of 58, suggesting moderate symptoms or difficulty in social, occupational, or school functioning. (AR 475.) Dr. Stanciell diagnosed Plaintiff with anxiety disorder (AR 475) and opined that Plaintiff would have no to mild limitations in: maintaining social functioning; focusing and maintaining attention; concentration, persistence, and pace; performing both simple and repetitive tasks; performing work activities on a consistent basis without special or additional supervision; completing a normal workday or work week; and, *inter alia*, handling the usual stresses, changes, and demands of gainful employment. (AR 476.)

**E. Reviewing Physicians**

Finally, on initial review (June 25, 2013) and on reconsideration (May 8, 2014), the reviewing state agency physicians found that Plaintiff had moderate difficulties in maintaining concentration, persistence, or pace (AR 66, 86) and was moderately limited in her ability to: perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances (AR 70, 90); complete a normal workday and work week without

interruptions from her psychologically abased symptoms and perform at a consistent pace (AR 71, 90); and respond appropriately to changes in the work setting (AR 71, 91).

### III.    ALJ's Decision

At Step Two, the ALJ found that Plaintiff did not have a severe mental impairment – that is, she determined that the medical evidence clearly established that Plaintiff had no more than a slight mental abnormality with a minimal effect on her ability to work.  *See Webb*, 433 F.3d at 686.  The ALJ explained that she reached this conclusion by considering the four broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listings of Impairments:  (1) daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation.  (AR 16.)  The ALJ found that Plaintiff had only mild limitations in all four areas.  With respect to daily living, the ALJ explained that "there is little objective evidence that [Plaintiff's] alleged mental impairments prevent her from performing routine daily activities or caring for her daughter." (AR 16.)  With respect to social functioning, the ALJ explained that, during the relevant period, Plaintiff had "significant others who all lived with her" and also retained the capacity to work part-time "caring for a gentleman."  (AR 17.)  With respect to concentration, persistence, or pace, the ALJ explained that Plaintiff had only a mild limitation because she was the primary caregiver for her young daughter as well as a part-time caregiver for a gentleman, and these activities required "cognitive and concentration capacity greater than she alleged." (AR 17.)  Finally, with respect to episodes of decompensation, the ALJ found that Plaintiff had experienced no episodes of decompensation and little evidence of a significant increase in her psychiatric symptoms corresponding to a significant decrease in her ability to care for her basic needs.  (AR 17.)  Based on the foregoing assessment, the ALJ concluded that Plaintiff's medically determinable mental impairments were non-severe.  (AR 17.)  The ALJ also included no mental limitations in her assessment of Plaintiff's RFC.  (*See generally* AR 18.)

The ALJ did not refer to or discuss *any* medical opinions in connection with her determination at step two of the sequential analysis. (AR 16-17.) Elsewhere in her decision, however, the ALJ described all five medical opinions as "defective" and discounted the portions of those opinions indicating that Plaintiff's ability to maintain concentration, persistence, and pace was more than minimally impaired. (*See* AR 20-21.) First, the ALJ discounted the opinions of the state agency reviewing physicians who found that Plaintiff had severe mental impairments that resulted in moderate difficulties in concentration, persistence, or pace because those physicians did not get a chance to review records showing that Plaintiff was the sole parent of a young child and worked part-time as a caregiver for another individual. (AR 20.) Second, the ALJ discounted the opinions of the examining physicians, Drs. Shore and Stanciell, on the grounds that both were internally inconsistent. (AR 20-21.) The ALJ noted that Dr. Shore assessed a GAF score of 63 (indicating only mild symptoms or some difficulty in social, occupational, or school functioning) but found that Plaintiff was moderately limited in her ability to maintain regular attendance and manage stress in a typical work setting. (AR 20-21.) Meanwhile, Dr. Stanciell, assessed a GAF score of 58 (indicating moderate symptoms or moderate difficulty in social, occupational, or school functioning) but assessed only mild limitations. (AR 20-21.) Finally, the ALJ discounted the opinion of Plaintiff's treating psychiatrist Dr. Kurre that Plaintiff has marked limitations in the area of concentration, persistence, or pace because of "[Plaintiff's] observed capacity to be the sole parent of a young child and a part-time caretaker of another individual." (AR 21.)

## IV. Discussion

As stated above, Step Two is "a *de minimis* screening device to dispose of groundless claims," and an ALJ may find that an alleged impairment is not severe only if the medical evidence "clearly establish[es]" a slight abnormality with no more than a minimal effect on an individual's ability to work. *Webb*, 433 F.3d at 686, 687. As summarized above, the medical evidence shows that Plaintiff received years of regular psychiatric treatment for depression,

13

anxiety, paranoia, and hallucinations. According to these treatment records, Plaintiff's mental health exams reflected hallucinations, either auditory, visual, or both, on more than 15 occasions during the three-and-a-half-year period between November 2012 and May 2016. (AR 809-10 (May 8, 2013 appointment with Dr. Patel), 816 (July 3, 2013 appointment with Dr. Patel), 819-20 (August 21, 2013 appointment with Dr. Patel), 868 (July 9, 2014 appointment with Dr. Patel), 871 (September 24, 2014 appointment with Dr. Patel), 879 (January 21, 2015 appointment with Dr. Patel), 881 (February 8, 2015 appointment with Dr. Patel), 883 (May 20, 2015 appointment with Dr. Patel), 885 (July 21, 2015 appointment with Dr. Patel), 887 (September 9, 2015 appointment with Dr. Patel), 755 (October 22, 2015 appointment with Dr. Kurre), 752 (November 17, 2015 appointment with Dr. Kurre), 750 (December 15, 2015 appointment with Dr. Kurre), 748 (January 12, 2016 appointment with Dr. Kurre), 746 (February 28, 2016 appointment with Dr. Kurre), 743 (March 15, 2016 appointment with Dr. Kurre), 741 (April 4, 2016 appointment with Dr. Kurre).) The record also shows that Plaintiff was consistently prescribed multiple antidepressants and antipsychotics, and her medications were frequently changed because her psychiatrists struggled to find a combination of medications that reliably controlled Plaintiff's mental health symptoms without causing unpleasant side effects. (*See, e.g.,* AR 802 (11/27/12 – increased Elavil), 804 (2/6/13 – increased Elavil), 805 (2/26/13 – increased Elavil), 810 (5/8/13 – discontinue Zoloft and start Seroquel), 811 (5/28/13 – discontinue Elavil due to weight gain, increase Celexa and Seroquel), 820 (8/21/13 – increase Paxil and Seroquel), 822 (10/2/13 – increase Seroquel), 800 (10/30/13 – increase Paxil and Seroquel), 824 (12/4/13 – increase Seroquel), 866 (5/28/14 – increase Trazodone), 868 (7/9/14 – increase Risperdal), 870 (9/24/14 – increase Risperdal), 872 (10/15/2014 – discontinue Risperdal, start Geodon, increase Paxil), 874 (11/12/14 – restart Risperdal, discontinue Geodon, increase Paxil), 876 (12/24/2014 – decrease Trazodone and Risperdal due to dizziness), 879 (1/21/2015 – increase Trazodone and decrease Risperdal, Plaintiff exhibits eye twitching and abnormal tongue/mouth movements), 880 (2/18/15 – discontinue Risperdal, start Latuda), 886 (9/9/2015 – discontinue Paxil and Latuda, start Cymbalta and Zyprexa, increase Trazodone).)

14

Additionally, four of the five doctors to consider the effect of Plaintiff's mental impairments on her ability to work opined that Plaintiff would be at least moderately limited in some areas of concentration, persistence, and pace. (*See, e.g.*, AR 66, 70, 71, 86, 90, 91 (opinions of the reviewing physicians); AR 435 (opinion of examining psychologist); AR 782-85 (opinion of treating psychiatrist, Dr. Kurre).) The ALJ disagreed, stating that Plaintiff was the primary caregiver for her young daughter as well as a part-time caregiver for a gentleman, and these activities required "cognitive and concentration capacity greater than [Plaintiff] alleged." (AR 17.) Elsewhere in the decision, the ALJ used the same rationale to discount Dr. Kurre's opinion that Plaintiff was "markedly" limited in her ability to maintain concentration, persistence, or pace, stating that Dr. Kurre's opinion was inconsistent with "[Plaintiff's] observed capacity to be the sole parent of a young child and a part-time caretaker of another individual." (AR 21.)

When the ALJ weighs conflicting medical opinions, the ALJ must articulate a "substantive basis" for rejecting a medical opinion or crediting one medical opinion over another. *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014). Generally, the Court will uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record. *Molina*, 674 F.3d at 1110. However, the ALJ must articulate "specific and legitimate reasons that are supported by substantial evidence" for discounting a treating or examining doctor's opinion. *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017). As explained below, the ALJ's reasons for discounting Dr. Kurre's opinion regarding Plaintiff's ability to maintain concentration, persistence, and pace – *i.e.*, Plaintiff's "capacity to be the sole parent of a young child" and her work as a part-time caregiver – do not satisfy this standard.

### A. Plaintiff's Status as a Single Mother

The ALJ's first reason for discounting Dr. Kurre's opinion was that Plaintiff is a single mother. Without more, however, a person's status as a mother or single parent has no bearing

on her functional capacity in a competitive work environment. *Cf. Trevizo*, 871 F.3d at 676 ("Absent specific details about [the plaintiff's] childcare responsibilities, those tasks cannot constitute 'substantial evidence' inconsistent with [a treating physician's] informed opinion, and thus the ALJ improperly relied on [the plaintiff's] childcare activities to reject the treating physician opinion."); *Garcia v. Colvin*, 162 F. Supp. 3d 1096, 1104 (D. Or. 2016) (ALJ erred in citing the plaintiff's "activities of being a single parent" as a reason for assigning less than full weight to a doctor's opinion that the plaintiff had moderate to severe mental limitations because "the ALJ neglected to recognize the amount of assistance that [the plaintiff] required to accomplish these things" and, further, the plaintiff had experienced three contacts from child protective services); *Beltran v. Berryhill*, No. 2:17-CV-01118-DWC, 2018 WL 1531926, at *3 (W.D. Wash. Mar. 29, 2018) (the plaintiff's actions as a parent did not necessarily contradict the physician's opinion that he has marked limitations in his ability to follow instructions and exercise judgment and, therefore, the fact that the plaintiff was raising a small child was not a specific, legitimate reason, supported by substantial evidence, to reject the physician's opinion); *Jones v. Berryhill*, No. 217CV00293BHSDWC, 2017 WL 5178514, at *2 (W.D. Wash. Oct. 16, 2017), report and recommendation adopted, No. 2:17-CV-00293-BHS, 2017 WL 5158188 (W.D. Wash. Nov. 7, 2017) (ALJ's conclusory statement that a doctor's findings were inconsistent with a plaintiff's ability to function as a single parent was not a specific and legitimate reason for discounting that doctor's opinion); *Powell v. Colvin*, No. C16-5558-BHS-JPD, 2016 WL 7665915, at *8 (W.D. Wash. Dec. 21, 2016), report and recommendation adopted, No. C16-5558BHS, 2017 WL 77858 (W.D. Wash. Jan. 9, 2017) ("The Court will not assume, simply by virtue of the fact that the plaintiff is a mother, that her daily activities are inconsistent with disability," and, therefore her motherhood is not a specific and legitimate reason for discounting a physician's opinion); *see also Heidy C. v. Berryhill*, No. EDCV 17-2302-KS, 2019 WL 451342, at *7 (C.D. Cal. Feb. 5, 2019) ("the Court rejects the Commissioner's attempt to discredit Plaintiff's statements solely because Plaintiff, a single mom of a then pre-teen boy, had not lost all motivation and physical capacity for being a mother to her son and, instead, persisted, to the best of her ability, in providing food, clothing,

16

transportation to school, and a clean home for her child"); *Rappe v. Colvin*, No. 1:14-CV-03195-JTR, 2015 WL 5692232, at *7 (E.D. Wash. Sept. 28, 2015) ("The ALJ erred in using Plaintiff's ability to care for her children and do household chores to discredit her."); *but see Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) (plaintiff's ability to "maintain[] a household and rais[e] two young children, with no significant assistance from her ex husband" was a legitimate reason supported by substantial evidence for discounting a doctor's opinion that the plaintiff could not bend, stoop, or, *inter alia*, crouch).

The record shows that, during the period in question, Plaintiff, to manage as a single parent, relied on assistance from the County of Riverside's CalWorks Program, which offered, *inter alia*, cash aid, mental health services, and financial assistance with child care. (*See* AR 841 (Plaintiff discusses compliance with CalWorks Program), 888 (Plaintiff notified that she no longer is eligible for mental health services through CalWorks)); *see also* COUNTY OF RIVERSIDE DEPARTMENT OF PUBLIC SOCIAL SERVICES, CALWORKS, http://dpss.co.riverside.ca.us/self-sufficiency/calworks (last visited March 14, 2019); *Gerritsen v. Warner Bros. Entm't Inc*., 112 F. Supp. 3d 1011, 1033 (C.D. Cal. 2015) ("Under Rule 201, the court can take judicial notice of '[p]ublic records and government documents available from reliable sources on the Internet,' such as websites run by governmental agencies."). There is, moreover, no Adult Function Report identifying Plaintiff's daily childcare activities, the ALJ did not question Plaintiff at the hearing about the nature of her childcare activities (*see generally* AR 27-56), and the ALJ did not elicit information from a third party about Plaintiff's performance as a parent. There is, therefore, no support in the record for the ALJ's assumption that Plaintiff performed activities as a parent that are inconsistent with Dr. Kurre's assessment of her mental limitations. Accordingly, the ALJ erred in using Plaintiff's status as a single parent as grounds for discounting Dr. Kurre's opinion and for finding that Plaintiff was not more than minimally limited in her ability to maintain concentration, persistence, or pace.

## B. Plaintiff's Part-Time Work

The ALJ's second reason for discounting Dr. Kurre's opinion and for finding, at Step Two, that Plaintiff is not more than minimally limited in concentration, persistence, and pace was that, for a period, Plaintiff worked part-time as a caregiver. This too is not a legitimate reason supported by substantial evidence for discounting Dr. Kurre's opinion.

The record shows that, during the period in question, Plaintiff found herself in dire financial circumstances and, to continue receiving assistance through CalWorks, had to comply with Riverside County's Welfare-to-Work requirements. In January 2013, Plaintiff told her therapist Irma Ficere – whom she saw through the CalWorks Program – that she was unable to pay her rent and would face eviction if she could not pay by March 1, 2013. (AR 837.) In June 2013, Plaintiff reported that she was trying to do "self-employment jobs" to pay her rent and be compliant with the CalWorks Program. (AR 841.) On July 31, 2013, Plaintiff reported that she had received her three-day eviction notice and had no back-up housing. (AR 845.) On August 13, 2013, Plaintiff reported that she had obtained two volunteer jobs to comply with the CalWorks' Program's Welfare-to-Work requirements. (AR 847.) In April 2014, Plaintiff reported that she was working part-time as a caregiver for an individual with Parkinson's Disease. (AR 855.) Plaintiff continued to report working as a part-time caregiver through July 2015. (AR 884; *see also id.* 872, 882, 859.) In October 2015, one month after Dr. Patel informed Plaintiff that she no longer belonged to the CalWorks Program (*see* AR 759), Plaintiff reported to her new psychiatrist, Dr. Kurre, that she was not employed. (AR 759.) Given Plaintiff's circumstances, the fact that she worked as a part-time caregiver for 18 months while participating in the CalWorks Program was not a legitimate reason supported by substantial evidence in the record for discounting Dr. Kurre's opinion regarding Plaintiff's ability to maintain concentration, persistence, and pace in a competitive work environment.

\\
\\

## C. Conclusion

In finding that the ALJ erred in discounting the opinion of Dr. Kurre, the Court notes that the ALJ used a similar rationale to discount the opinion of the two reviewing physicians, who both found that Plaintiff was moderately limited in her ability to maintain concentration persistence and pace. (AR 20.) Specifically, the ALJ stated that the reviewing physicians' opinions were "not supported" because the reviewing physicians did not get a chance to review records showing that Plaintiff was the sole parent of a young child and worked part-time as a caregiver for another individual. (AR 20.) The ALJ is incorrect: the reviewing physicians *did* get a chance to review records from Dr. Patel indicating that Plaintiff was a single mother. (*See* AR 796 (November 7, 2012 treatment note from Dr. Patel), 61 (reflecting that Dr. Patel's records were sent to the reviewing physician for review on February 8, 2013 – three months after the relevant treatment note was written).) Moreover, for the reasons stated above, regardless of what the reviewing physicians did or did not review, it was unreasonable for the ALJ to infer from Plaintiff's status as a single mother and her part-time employment that the reviewing physicians' assessment of Plaintiff's mental limitations was incorrect. *See Molina*, 674 F.3d at 1110.

In sum, the ALJ failed to articulate legally sufficient reasons supported by substantial evidence for discounting the opinions of Dr. Kurre and other medical sources that Plaintiff was more than minimally limited in maintaining concentration, persistence, or pace. Further, the ALJ's conclusion at Step Two that Plaintiff had no more than a slight mental abnormality with no more than a minimal effect on her ability to work was not "clearly established" by the medical evidence. *See Webb*, 433 F.3d at 687. The Court cannot say that these errors, which occurred very early in the sequential analysis, were inconsequential to the ultimate nondisability determination, nor can the Court reasonably discern the ALJ's path despite her errors. *See Brown-Hunter*, 806 F.3d at 492. Accordingly, the errors are not harmless, and the matter must be remanded. *See id.*

## V.     Remand is Warranted

It is deeply troubling that, at Step Two, a *de minimis* screening threshold, the ALJ discounted Plaintiff's significant history of psychiatric treatment and deemed Plaintiff's alleged mental impairment "groundless" primarily because Plaintiff was a single mother who worked a part-time job.   Nevertheless, the Court cannot say that further administrative proceedings would serve no useful purpose and, if the improperly discredited evidence were credited as true, the ALJ would be required to find Plaintiff disabled on remand.  *See Garrison*, 759 F.3d at 1020.  This case, then, is not the "rare exception" in which the credit as true rule should be applied and the matter remanded for the calculation and award of benefits.  *See Leon v. Berryhill*, 874 F.3d 1130, 1133 (9th Cir. 2017).  Therefore, the Court remands for further consideration.

\\
\\
\\
\\
\\
\\
\\
\\
\\
\\
\\
\\
\\
\\
\\

**CONCLUSION**

For the reasons stated above, IT IS ORDERED that the decision of the Commissioner is REVERSED, and this case is REMANDED for further proceedings consistent with this Memorandum Opinion and Order.

IT IS FURTHER ORDERED that the Clerk of the Court shall serve copies of this Memorandum Opinion and Order and the Judgment on counsel for plaintiff and for defendant.

LET JUDGMENT BE ENTERED ACCORDINGLY

DATE: March 19, 2019

KAREN L. STEVENSON
UNITED STATES MAGISTRATE JUDGE